UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| CHARLES E. SOPTICH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  3:15cv109 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits and Supplemental Security Insurance, 42 U.S.C. § 401 *et seq*.  Section 205(g)

of the Act provides, *inter alia*, "[a]s part of his answer, the [Commissioner] shall file a certified

copy of the transcript of the record including the evidence upon which the findings and decision

complained of are based.  The court shall have the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

2.	The claimant has not engaged in substantial gainful activity since January 31, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.* , and 416.971 *et seq.*)

3.	The claimant has the following severe impairments: history of lumbar fusion; and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift, carry, push and pull up to 20 pounds occasionally and up to 10 pounds frequently; standing and/or walking (with normal breaks) for approximately 6 hours per 8 hour work day and sitting (with normal breaks) for approximately 6 hours per 8 hour work day; with the option to sit or stand alternatively at will provided he not be off task more than 10% of the work period; climbing of ramps and stairs occasionally; never climbing ladders, ropes or scaffolds; balancing frequently; stooping, crouching, kneeling and crawling occasionally; and avoid concentrated exposure to excessive vibration. Unable to engage in complex or detailed tasks, but can perform simple, routine and repetitive tasks consistent with unskilled work; and is able to sustain and attend to task throughout the workday. Limited to superficial interaction with coworkers, supervisors and the public, with superficial interaction defined as occasional, and casual contact not involving prolonged conversation or discussion of involved issues. Contact with supervisors still involves necessary instruction.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.	The claimant was born on January 24, 1966 and was 45 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 25-32)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on July 10, 2015. On October 23, 2015, the defendant filed a memorandum in support of the Commissioner's decision, and on November 4, 2015, Plaintiff filed his reply. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not

disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Insurance (SSI) on February 10, 2012, alleging disability beginning May 1, 2008. At his hearing, Plaintiff amended his alleged onset date to January 21, 2012. The Disability Determination Bureau (DDB) denied the Plaintiff's claims on April 2, 2012. Plaintiff requested reconsideration, but was again denied on May 29, 2012. Plaintiff filed a request for an administrative hearing on June 5, 2012. On August 22, 2013, Plaintiff appeared for a hearing in Fort Wayne, Indiana before ALJ Maryann Bright of the Fort Wayne Office of Disability Adjudication and Review. On October 25, 2013, ALJ Bright issued an unfavorable decision, concluding Plaintiff's impairments permitted the performance of other work. Plaintiff filed a request for review by the Appeals Council of the Office of Disability Adjudication and Review, but the Appeals Council denied his request for review on January 16, 2015. Plaintiff then timely filed a complaint with this Court.

The Plaintiff was born on January 24, 1966. At the time of his amended alleged onset date, he was 45 years of age. (Tr. 41) Plaintiff completed a two-year degree after graduating high school. *Id.* at 43. He has previously worked as an RV assembler, furniture sales person, van converter, and sales person. *Id*. at 65. Plaintiff stopped working in 2005 when he underwent back surgery. *Id* at 172, 175. He attempted to work from 2006-2008, but stopped earning in 2008 and had minimal earnings in 2010, 2011, and 2012. *Id*.

An MRI, taken on August 30, 2004 of Plaintiff's lumbar spine, per the orders of Dr. Michael Hartman, revealed "underlying degenerative disc disease at the L4-5 and L5-S1 levels, as described. At L4-5 and L5-S1 generalized annular disc bulges are appreciated. At L4-5 an additional focal disc herniation posteriorly can be seen with disc material abutting both L5 nerve root sleeves." (Tr. 314) Dr. David Beatty administered a lumbar epidural steroid injections on October 6, 2004, and October 27, 2004. After the conclusion of the latter procedure, Dr. Beatty noted "He is better than he was. He is not as good as he could be. We had a long talk about whether he would be able to go back to the same work that he did. I suggested he needed to look into another line of work." (Tr. 376; 375) Plaintiff underwent lumbar diskographies at L3-4, L4-5, and L5-S1 on January 12, 2005, in response to his pre-op diagnoses of low back pain with radiculopathy and lumbar degenerative disk disease. Dr. David Beatty completed the procedures. (Tr. 373) On April 27, 2005, Plaintiff underwent a decompressive lumbar laminectomy with partial fasciectomies and foraminotomies at L4-5 and L5-S1; posterolateral arthrodesis at L4-5 and L5 S1; instrumentation at L4-5 and L5-S1 using titanium screws, rods, and cross wings; and right posterior iliac crest bone graft harvest, performed by Dr. Michael Hartman. (Tr. 243) These procedures were performed in response to Plaintiff's pre-op diagnoses of degenerative disc disease, spinal stenosis at L4-L5 and L5, low back pain, and bilateral lower extremity radiculopathy. *Id.*

Plaintiff presented to Dr. Henry DeLeeuw on March 1, 2006, for an orthopedic consultation. *Id.* at 263. Dr. DeLeeuw noted Plaintiff's surgery ten months prior, as well as "He is not any better. He has terrible pain. He has not returned to work. He has been off work ten weeks. He is using a cane. His insurance has run out. He filed bankruptcy. He wouldn't go back to that

physician because he filed bankruptcy. He has back pain primarily, but not much in the way of leg pain, it is worse when he stands and walks." *Id*. Upon exam, Dr. Deleeuw noted Plaintiff to have a flat affect and appeared depressed. He further noted Plaintiff to be "somewhat uncooperative" in the x-ray suit[e], secondary to Plaintiff's back "absolutely killing him." *Id*. After reviewing the imaging, Dr. DeLeeuw established that "He has somewhat of a kyphotic L4-S1 segment. I don't see a solid fusion." He concluded the visit by stating "I don't have any great answers for Charles. It is going to be difficult for him to get better. I don't think I will be able to help him." *Id*.

Plaintiff presented to Dr. David Beatty for an initial visit on January 18, 2012, complaining of lower back pain which measured nine out of ten and which he described as "unbearable." (Tr. 339) He reported, "I've been holding out for as long as I could, but I just can't take it anymore." *Id*. Dr. Beatty noted that "Any activity aggravates his pain and he walks with some difficulty. His pain radiates down both legs all the way to his heels, right greater with numbness and tingling." *Id*. Dr. Beatty noted a lumbar spine x-ray showing osteophytes anteriorly and evidence of spondylosis at L3-4. *Id*. at 341. He ordered an MRI, increased Plaintiff's Vicodin dose, and scheduled a follow-up. *Id*. at 341-342. A lumbar spine MRI, taken on January 26, 2012, per the orders of Dr. Beatty, revealed diffuse disc bulge resulting in flattening of the intrathecal sac and mild facet arthropathy at L3-4; as well as diffuse disc bulge resulting in mild central canal stenosis and superimposed facet arthropathy resulting in moderate-severe left/mild right neural foraminal narrowing at L2-3. *Id*. at 363. On February 2, 2012, Plaintiff returned to Dr. David Beatty for a follow-up exam, complaining of bilateral lumbar spine pain measuring 9-10/10 and indicating Vicodin "doesn't do anything for my pain. I get minor relief at best." *Id*. at 333. Dr. Beatty performed a thorough exam and reviewed an MRI from January 26, 2012. *Id*. at

335. Dr. Beatty started Plaintiff on MS Contin 15 mg, and noted "He has stopped working from the pain. In the future he may be a candidate for a SCS (spinal cord stimulator)/ pump (pain pump)." *Id.*

On March 11, 2012, Dr. Richard Wenzler, a medical consultant for the DDB, completed a physical residual functional capacity evaluation. In this, he noted that "Though the meor [medical evidence of record] in file supports clmts back allegations, it is insuff[icient] to support onset (see test results) and clmt severity would be expected to improve with recently initiated therapies." (Tr. 384)

Plaintiff presented to Dr. Stefanie Wade on March 23, 2012 for a consultative psychological examination at the request of the DDB. *Id.* at 387. Plaintiff mainly complained of physical maladies stemming from chronic back pain, but stated that he believed this pain interfered with his concentration and his back surgery in 2005 was a catalyst for his worsening depression. *Id.* Dr. Wade noted Plaintiff to possess an anxious mood and affect, ("he was antsy and reiterated several times that the interview was `stressing me out.'") as well as limited insights into his behavior and the consequences of such behavior. *Id.* at 389. Dr. Wade documented:

> Charles reported that his daily activities included getting out of bed at 7AM, after waking several times throughout the night, sometimes staying awake for 2-hour stretches. He spends his days watching television. He stated that he tries to walk up and down stairs, around the house, or to the store 3 blocks away. He noted that the walk to the store is rare, as he has great pain after such an outing. He washes his own dishes once a week. He does laundry once a week as well. He does not mop or sweep, stating that he has wooden floors and does not `track in dirt." He cooks on the stove once or twice a week, cooking fish, chicken, and potatoes. He showers daily and brushes his teeth every day.
>
> Charles's daily routines do not appear to be well established. He needs some support from others to accomplish appropriate daily tasks, as he seems to do little cleaning or cooking. His daily activities appear to be simple. His ability to sustain

these efforts on a daily basis appears to be somewhat impaired. It is difficult to
determine how much of this impairment is due to mental health issues, however, as
Charles seemed to have little ability to separate physical from mental impairments.

*Id*. at 389-390. Dr. Wade concluded Plaintiff "has poor concentration, and his frustration

tolerance is limited." *Id*. She also felt his interaction with others would need to be time-limited.

*Id*. She offered diagnoses of recurrent moderate major depressive disorder and adjustment

disorder with anxiety, accompanied by a GAF score of 58. *Id.*

At a follow up with Dr. Beatty in July, Plaintiff reported that his pain was "unchanged

since last visit. However he feels his meds aren't as they used to be." *Id*. at 433. He reported, "I

try to get up and walk a little [ ] I have to do that or I'll turn into a piece of jello." *Id*. Noting that

Plaintiff could not take Methadone or Fentanyl, Dr. Beatty refilled his prescription for MS

Contin. *Id*. at 435. On December 7, 2012, Plaintiff returned to Dr. Beatty complaining of lower

back pain "which is worse since last visit. Currently taking MS Contin 15 mg BID, last dose this

morning. This is not as effective as when he first started taking it." *Id.* at 430. He rated his pain as

10/10 and described stabbing pains in his lower and mid back, numbness, tingling, and shooting

pain down his legs. *Id*. In response, Dr. Beatty increased Plaintiff's dose of MS Contin, and

ordered an MRI to see the progression of Plaintiff's impairments. *Id*. at 432.

Plaintiff returned to Dr. Beatty on May 3, 2013, stating "My pain is so much worse and

the meds don't work. If I do any type of physical activity my pain shoots into the 10's. It's an

8/10 all the time at the lowest." *Id*. at 427. Noting the claimant's pain "is out of proportion to the

MRI results," Dr. Beatty ordered a lumbar myelogram in an attempt to determine the etiology of

Plaintiff's pain. *Id.* at 429. On May 23, 2013, Plaintiff underwent a lumbar myelogram at Elkhart

General Hospital in response to his diagnoses of spinal stenosis and back pain radiating down

both legs, ordered by Dr. Beatty. *Id*. at 413. This imaging revealed disc herniations at L2-3 and L3-4 (his surgery was L4-5 and L5-S1) and the interpreting radiologist diagnosed, "Multilevel degenerative changes. Predominantly seen at the L2-L3 and L3-L4. At L2-L3, there is bilateral moderate neural foramina narrowing with possible impression on the exiting nerve roots. At L3 L4, there is moderate left neural foraminal narrowing with possible impression on the exiting nerve root." *Id.* at 414-415. At a follow up in May, Plaintiff reported that "he has a lot more pain in the middle of his back at L1-2. . . Pain today is 9/10." *Id.* at 424. Dr. Beatty continued Plaintiff's MS Contin dose and prescribed Ambien to help Plaintiff sleep. *Id.*

Plaintiff presented to Dr. Hochstetler at the Center for Healing and Hope on June 6, 2013, complaining of increased back pain, specifically stating that "pain is causing depression." *Id.* at 412. Dr. Hochstetler observed that the claimant "unable to stay in any position very long," exhibited a depressed mood and anxiety, and expressed concern about becoming addicted to opiates. *Id.* He diagnosed chronic back pain, prescribed Effexor, and noted the claimant "needs point person- MD to coordinate tx- consider other pain mgmt. alternatives." Plaintiff received a referral to establish long-term care with a primary care physician at Heart City. *Id.*

Plaintiff returned to Dr. Beatty on June 27, 2013, complaining of continued bilateral lumbar spine pain, rated at an 8/10, that radiated down his legs and worsened with "any activity." *Id.* at 421. Dr. Beatty adjusted Plaintiff's prescription of MS Contin secondary to complaints about increased anxiety from his current dose, and offered to complete an SI joint injection. *Id.* at 423. The physician wrote, "He is going to get another surgical opinion. I offered an SI joint injection he prefers not to do this at this point." *Id.* Despite his hesitance, on July 8, 2013, Plaintiff underwent a diagnostic right sacroiliac joint injection in hopes of alleviating his pain. *Id.*

at 418. Dr. Beatty reduced Plaintiff's dose of MS Contin at his request on November 25, 2013, in response to Plaintiff calling in and stating that his current dose had reduced his appetite, leading to weight loss of ten pounds. *Id*. at 443.

On August 22, 2013, Plaintiff presented for a video hearing in Elkhart, Indiana before ALJ Bright of the Fort Wayne, Indiana Office of Disability Adjudication and Review. Also present were the claimant's attorney, Janee Mitchell, and Vocational Expert Marie Kieffer. *Id.* at 37-72. Plaintiff testified about his treatment to the ALJ, stating that he experienced grogginess as a side effect from his medications, underwent a lumbar fusion in 2005, and endured inadequate outpatient injection procedures. *Id.* at 51-52. He expressed limitations of no more than seven minutes of sitting at one time, a very limited ability to stand, and an inability to even walk to the next-door grocery store secondary to pain. *Id.* at 43; 51. He further testified about ineffective physical therapy and that, as far as surgical pain intervention modalities went, "Surgically implanting anything in me again, I just, I'm leery of, totally leery of." *Id.* Plaintiff stated that in a previous work attempt doing furniture sales he definitely noticed his pain affecting his concentration and that he didn't have a social life whatsoever, as his injury "has got me at home doing nothing." *Id*. at 56. Plaintiff testified that lived alone and had no one to help him, rendering him responsible for his cooking, cleaning, and miscellaneous chores, completing "whatever I can do." *Id*. at 57. He further responded that his day consisted of "a lot of sitting around, a lot of hanging out on the couch" where he mostly watched television. *Id.*

Vocational expert Marie Kieffer then testified. Ms. Kieffer identified Plaintiff's past work of an RV assembler (D.O.T. code 806-684.018) as semi-skilled, medium, light to medium as performed, SVP of 3; Furniture sales person (D.O.T. code 270.357-030) as light, SVP of 4; Van

converter (D.O.T. code 806.381-070) as medium, SVP of 5; and Sales person (D.O.T. code 279.357-050) as light, SVP of 4. *Id.* at 65. The ALJ then presented a hypothetical in which an individual had the residual functional capacity to lift, carry, push and pull up to 20 pounds occasionally and up to 10 pounds frequently; standing and/or walking (with normal breaks) for approximately 6 hours per 8 hour work day and sitting (with normal breaks) for approximately 6 hours per 8 hour work day; with the option to sit or stand alternatively at will provided he not be off task more than 10% of the work period; climbing of ramps and stairs occasionally; never climbing ladders, ropes or scaffolds; balancing frequently; stooping, crouching, kneeling and crawling occasionally; and avoid concentrated exposure to excessive vibration; unable to engage in complex or detailed tasks, but can perform simple, routine and repetitive consistent with unskilled work; and is able to sustain and attend to task throughout the workday; limited to superficial interaction with coworkers, supervisors and the public, with superficial interaction defined as occasional, and casual contact not involving prolonged conversation or discussion or involved issues; and contact with supervisors still involves necessary instruction. *Id.* at 65-67.

Ms. Kieffer testified that no past relevant work would be able to be performed, but that this hypothetical individual could perform the occupations of small products assembler (D.O.T. 706.684-022) light, SVP of 2, 600 jobs in the region, 10,000 in the state, and 200,000 available nationally; electronics worker (D.O.T. 726.687-010) light, SVP of 2, 100 jobs in the region, 1,500 in the state, and 90,000 nationally; and a laundry folder (D.O.T. 369.687-018) as light, SVP of 2, 75 jobs in the region, 1,000 in the state, and 40,000 nationwide. *Id.* at 66-68. The VE testified that a person who is unable to maintain concentration, persistence, and pace due to focus and pain issues for at least one hour of an eight hour day would not be able to sustain employment. *Id.* at

68.  The ALJ then furthered her cross examination, asking if the individual required some type of written reminders or prompting as far as essential job tasks to help remember, would that affect the ability to work.  Ms. Kieffer testified that this limitation "would preclude the ability to do the job." *Id.*  at 69.

On October 25, 2013, ALJ Bright issued an unfavorable decision. (Dkt. 12 at 20-36) At Step Two, the ALJ concluded that the claimant suffers from the following severe impairments: history of lumbar fusion and major depressive disorder. *Id.*  at 25. At the first half of Step Three, the ALJ determined the claimant had no impairment or combination of impairments that met or equaled any of the listed impairments. *Id.*  at 26. At the second half of Step Three, the ALJ found that the claimant had the residual functional capacity to lift, carry, push and pull up to 20 pounds occasionally and up to 10 pounds frequently; standing and/or walking (with normal breaks) for approximately 6 hours per 8 hour work day and sitting (with normal breaks) for approximately 6 hours per 8 hour work day; with the option to sit or stand alternatively at will provided he not be off task more than 10% of the work period; climbing of ramps and stairs occasionally; never climbing ladders, ropes or scaffolds; balancing frequently; stooping, crouching, kneeling and crawling occasionally; and avoid concentrated exposure to excessive vibration.  Unable to engage in complex or detailed tasks, but can perform simple, routine and repetitive consistent with unskilled work; and is able to sustain and attend to task throughout the workday. Limited to superficial interaction with coworkers, supervisors and the public, with superficial interaction defined as occasional, and casual contact not involving prolonged conversation or discussion or involved issues. Contact with supervisors still involves necessary instruction. *Id.*  at 27. At Step Four, the ALJ concluded the claimant could not perform past relevant work of as an RV

assembler, furniture sales person, van converter, and sales person. *Id.* at 30. At Step Five, the ALJ found that the claimant could perform the following occupations: electronics worker, small products assembler, and laundry folder. *Id.* at 31. Plaintiff's claim for benefits was denied upon this Step Five finding. *Id.* at 32.

Plaintiff first argues that the ALJ erred by failing to explain why she discredited opinion evidence which contradicts her conclusion that the Plaintiff can sustain concentration throughout an eight hour work day. Medical opinions often play a dispositive role in the Social Security Administration's assessment of a claimant's RFC. In fact, the agency's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). They also provide that an ALJ must weigh such opinions with consideration of whether they treated the claimant, whether they examined the claimant, whether they have "consider[ed] all the pertinent evidence," and whether the opinion is "consistent . . . with the record as a whole." *Id.* at § 404.1527(c)(1)(4). Further, SSR 96-8p mandates that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

In the present case, the ALJ concluded Plaintiff can "sustain and attend to tasks throughout the workday" and deal with any work place changes. Plaintiff argues that the ALJ never explained why she rejected the opinion of the consultative psychological examiner (Dr. Wade) that Plaintiff "has poor concentration, and his frustration tolerance is limited." (Tr. 390) Although the ALJ mentioned the examiner's opinion which supports Plaintiff's claim to disability, (Tr. 29) she then stated that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than

those determined in this decision." (Tr. 30) Additionally, despite invoking the Plaintiff's daily

activities to reject his allegations of disabling back pain, the ALJ never mentioned the

psychological examiner's observation that "[h]is ability to sustain these efforts on a daily basis

appears to be somewhat impaired." (Tr. 390)

Plaintiff contends that the ALJ's finding that he can sustain concentration without any

difficulties is expressly contradicted by the examiner's opinion that he would have difficulty

maintaining his concentration. Plaintiff argues that the ALJ's finding that he has daily activities

which suggest he can sustain work activity is contradicted by the examiner's observation of his

profound difficulties sustaining such activities. Plaintiff concludes that the ALJ had an obligation

to explain why she discredited the examiner's opinion and observations, and her failure to satisfy

this obligation renders meaningful review of her unfavorable decision impossible.

The Seventh Circuit has repeatedly insisted that an ALJ must build a logical and accurate

bridge between the relevant medical evidence and her conclusions to enable meaningful review.

*Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *see also Ellis v. Astrue*, No. 2:10-CV-452,

2012 WL 359305, at *10 (N.D. Ind. Feb. 2, 2012) ("The court will not speculate on the basis of

the ALJ's opinion."); *see also Rinaldi-Mishka v. Astrue*, No. 12-C-1305, 2013 WL 3466844, at

*12 (N.D. Ill. July 8, 2013) ("[T]he ALJ `must at least minimally articulate' her analysis to allow

meaningful review"). An ALJ must confront the evidence that does not support her conclusion

and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004);

*Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003); *Brindisi v. Barnhart*, 315 F.3d 783, 786

(7th Cir.2003).

In response, the Commissioner argues that the ALJ incorporated Dr. Wade's opinion in

her decision. While it is true that Dr. Wade's opinion was discussed, Plaintiff is correct that the ALJ failed to explain why she was rejecting Dr. Wade's opinion that Plaintiff has "poor concentration, and his frustration tolerance is limited." As the ALJ failed to account for Plaintiff's moderate limitations with concentration, persistence and pace which are reflected by Dr. Wade's examination and opinion, the ALJ's decision must be remanded. *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014).

Next, Plaintiff argues that the ALJ improperly discounted his allegations of severe pain. In assigning a Residual Functional Capacity, the ALJ must consider the claimant's testimony, the objective medical evidence, and opinions from medical sources. 20 C.F.R. § 404.1545(3). A court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004)). However, an ALJ does not possess unlimited discretion to reject a claimant's testimony. When the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. A court may reverse a credibility determination if it finds that the rationale provided is "unreasonable or unsupported." *Prochaska*,454 F.3d at 738 (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006)). In sum, credibility determinations "based on errors of fact or logic" are not binding on courts. *Allord v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006).

Plaintiff contends that the ALJ's decision to reject his allegations of severe, disabling back pain was "patently wrong." The ALJ opined that "[t]here is no evidence that either his physical or

mental conditions worsened at the time of the amended alleged onset date" in January of 2012.

(Tr. 29) Plaintiff claims that this assertion is erroneous. Plaintiff points out that the record shows

he presented to Dr. Beatty for an initial visit on January 18, 2012, complaining of lower back pain

which measured nine out of ten and which he described as "unbearable." (Tr. 339) Plaintiff stated

that "I've been holding out for as long as I could, but I just can't take it anymore." *Id*. Dr. Beatty

noted that "Any activity aggravates his pain and he walks with some difficulty. His pain radiates

down both legs all the way to his heels, right greater with numbness and tingling." *Id*. Dr. Beatty

noted a lumbar spine x-ray showing osteophytes anteriorly and evidence of spondylosis at L3-4.

*Id*. at 341. He ordered an MRI, increased Plaintiff's Vicodin dose, and scheduled a follow-up. *Id*.

at 341-342. A lumbar spine MRI, taken on January 26, 2012, per the orders of Dr. Beatty,

revealed diffuse disc bulge resulting in flattening of the intrathecal sac and mild facet arthropathy

at L3-4; as well as diffuse disc bulge resulting in mild central canal stenosis and superimposed

facet arthropathy resulting in moderate severe left/mild right neural foraminal narrowing at L2-3.

*Id*. at 363. On February 2, 2012, Plaintiff returned to Dr. David Beatty for a follow-up exam,

complaining of bilateral lumbar spine pain measuring 9-10/10 and indicating Vicodin "doesn't do

anything for my pain. I get minor relief at best." *Id*. at 333. Dr. Beatty performed a thorough

exam and reviewed an MRI from January 26, 2012. *Id*. at 335. Dr. Beatty started Plaintiff on MS

Contin 15 mg, and noted "He has stopped working from the pain. In the future he may be a

candidate for a SCS (spinal cord stimulator)/pump (pain pump)." *Id.*

Clearly, as the above recitation shows, Plaintiff is correct, and the ALJ's finding that the

record contains no evidence of worsening condition which corresponds to the Plaintiff's alleged

onset date is not supported by the record. Thus, a remand is appropriate.

Plaintiff also contends that the ALJ also improperly invoked the Plaintiff's effort to return to work after his initial spinal surgery in 2005. The ALJ stated that after this surgery "he was able to return to fairly strenuous work activity for several years." (Tr. 29) However, this is not an accurate characterization of the record regarding Plaintiff's response to his first surgery. In fact, earnings records show that Plaintiff stopped working in 2005 when he underwent back surgery. *Id*. at 172, 175. Plaintiff attempted to work from 2006-2008, but stopped earning in late 2008 and had minimal earnings in 2010, 2011, and 2012. *Id.* The medical evidence helps explain the Plaintiff's struggle to return to sustained work after his first surgery. For example, the record shows that the claimant presented for an orthopedic consultation ten months after his surgery and the examining physician wrote "I don't see a solid fusion" and documented, "He is not any better. He has terrible pain. He has not returned to work. He has been off work ten weeks. He is using a cane. His insurance has run out. He filed bankruptcy. He wouldn't go back to that physician because he filed bankruptcy. He has back pain primarily, but not much in the way of leg pain, it is worse when he stands and walks." *Id.* at 263. He concluded the visit by stating "I don't have any great answers for Charles. It is going to be difficult for him to get better. I don't think I will be able to help him." *Id.* When Plaintiff met with Dr. Beatty in early 2012, he reported, "I've been holding out for as long as I could, but I just can't take it anymore." *Id.*

In light of these facts, this Court agrees with Plaintiff that it was incorrect for the ALJ to assert the Plaintiff's first surgery was "generally successful in relieving the claimant's symptoms" and he "was able to return to fairy strenuous work activity for several years." (Tr. 29) Nor was it logical to invoke work activity from a period when the Plaintiff did not allege he was disabled to discount allegations that he was disabled during a later period when he was not performing such

work activity.   In fact, the Seventh Circuit has very recently stated that "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability". *Hill v. Colvin*, No. 15-1230, *12 (7th Cir. December 3, 2015), quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983); *see also Voight v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) (claimant's desire to work, but inability to find work, is "consistent with his wanting to lead a normal life yet being unable to land a job because he's disabled from gainful employment"); *Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994)(explaining that claimant might be earning a decent wage despite being permanently disabled).

Additionally, the ALJ improperly invoked the Plaintiff's course of treatment to discredit his allegations of disabling back pain.  The ALJ opined that Plaintiff's treatment was "essentially routine and/or conservative in nature," but only spent one paragraph discussing his treatment after his alleged onset date. (Tr. 28-29) Clearly, though, back surgery is not "essentially routine and/or conservative," and, as noted above, the ALJ's corresponding rationale that such surgery was "generally successful" is not an accurate characterization of the record.

Moreover, the ALJ ignored an entire line of evidence showing the Plaintiff's persistent reports of pain, persistent efforts to seek relief for that pain, reports that his pain medications were not alleviating his pain, and efforts to seek another surgical opinion and undergo injections in hopes of alleviating his severe pain. The Seventh Circuit has held that "[a]n ALJ may not ignore entire lines of evidence" and "must consider all of the evidence and must explain its decision such that it may be meaningfully reviewed." *Arnett v. Astrue*, 676 F.3d 586, 592-593 (7th Cir. 2012). An ALJ must consider all relevant medical evidence and cannot cherry-pick facts that support a finding of non-disability while ignoring evidence supporting disability. *Denton v. Astrue*, 596

F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009)).   As

SSR 96-7p explains:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

Because the ALJ's opinion contains no consideration of Plaintiff's continued efforts to seek relief

for his severe pain, this Court holds that the ALJ failed to build a logical and accurate bridge

between the evidence and her conclusion that Plaintiff's course of treatment undermines his

allegations of disabling back pain. (Tr. 28-29)

Further, the ALJ  improperly invoked the Plaintiff's limited daily activities to discount his

allegations of disabling pain. The ALJ stated that Plaintiff "has described daily activities that are

not limited to the extent one would expect," and cited his ability to do laundry, wash dishes,

prepare his own meals, and go grocery shopping. (Tr. 29)  But the ALJ ignored the evidence of

Plaintiff's limited daily activities, specifically overlooking how he washes dishes and does

laundry only once a week. The ALJ ignored the consultative examiner's observation that the

claimant's "daily routines do not appear to be well established.  He needs some support from

others to accomplish appropriate daily tasks, as he seems to do little cleaning or cooking.  His

daily activities appear to be simple. His ability to sustain these efforts on a daily basis appears to

be somewhat impaired." *Id*.  As noted, an ALJ cannot cherry pick facts which support her

findings and ignore those which contradict them. *Denton*, 596 F.3d at 425.

The Seventh Circuit has repeatedly explained that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [he] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-279 (7th Cir. 2013) (citations omitted); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Thus, the Plaintiff's limited daily activities cannot provide the logical bridge to uphold the ALJ's decision. Due to the numerous factual and logical flaws underlying it, the ALJ's adverse credibility determination is "patently wrong" and warrants remand. *Clifford*, 227 F.3d at 872; *Allord*, 455 F.3d at 821. *See also Hill*, at *13 ("we have repeatedly warned against equating the activities of daily living with those of a full-time job.").

Conclusion

On the basis of the foregoing, the decision of the Commissioner is hereby REMANDED for proceedings consistent with this opinion.


 Entered: December 16, 2015.


                                        s/ William C.  Lee
                                        William C. Lee, Judge
                                        United States District Court